UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Cr. No. 20-261 (DSD/TNL)

| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)|
| Plaintiff, | )<br>)<br>) |
| vs. | )   **DEFENDANT'S POSITION**<br>)   **REGARDING SENTENCING**<br>) |
| ADITYA RAJ SHARMA, | )<br>) |
| Defendant. | ) |

## INTRODUCTION

Mr. Sharma pled guilty to one count of Wire Fraud, agreeing in the plea agreement that he fraudulently applied for PPP loans (ECF No. 51, pp. 1–2, 5–6). While he agrees he applied for and received loans for large amounts of money, and he agrees the sentencing guidelines range in this case is 63–78 months (PSR, ECF No. 68, ¶ 71), it is respectfully submitted Mr. Sharma's unique personal factors justify a sentence of probation. Mr. Sharma is a 48-year-old successful businessman, software developer, and devoted family man. He has no history of fraud. The defense will further explain, through this position regarding sentencing, the facts of the case, the personal circumstances of Mr. Sharma, and how the 18 U.S.C. § 3553(a) factors justify a probationary sentence.

## OUTSTANDING DEFENSE PSR OBJECTIONS

Mr. Sharma has several outstanding PSR objections and corrections as follows:

*Preliminary PSR (ECF No. 62), paragraph 7* (Final PSR (ECF No. 68), paragraph 8): Mr. Sharma challenged his removal from Crosscode, he denies all Board allegations, he asserts that all the documents were fully audited financials meeting industry standards, and he entered into a settlement agreement. The PSR included this information in paragraph 22 of the final PSR, but not in paragraph 8.

*Preliminary PSR (ECF No. 62), paragraph 18* (Final PSR (ECF No. 68), paragraph 19): Mr. Sharma withdraws this objection. Mr. Sharma will ensure restitution is paid in full as explained below.

*Preliminary PSR (ECF No. 62), paragraph 20* (Final PSR (ECF No. 68), paragraph 21): In addition to his acceptance of responsibility statement, on November 13, 2020, Mr. Sharma voluntarily provided what can only be described as a confession to FBI agents at the airport.

*Preliminary PSR (ECF No. 62), paragraphs 24, 30, 34, and 68* (Final PSR (ECF No. 68), paragraphs 26, 32, 36, and 71): Mr. Sharma waives his loss amount objection, but moves this Court for a downward departure based on the lesser actual loss amount.

*Preliminary PSR (ECF No. 62), paragraph 47* (Final PSR (ECF No. 68), paragraph 49): Mr. Sharma obtained his undergraduate degree in 1995, not 1996.

*Preliminary PSR (ECF No. 62), paragraph 49* (Final PSR (ECF No. 68), paragraph 51): Mr. Sharma's older child's name is misspelled in the fourth line.

# BACKGROUND[1]

In addition to the information Mr. Sharma provided to Probation Officer Sara De La Riva Brunzell, Mr. Sharma has provided the following background information to undersigned counsel to inform further the Court about his background and circumstances.

Mr. Sharma was born in Jammu, India. He grew up in Allahabad, now called Prayagraj, in north India, with his parents and younger brother by six years. His father was a high-ranking official within the Indian government at the time and worked in Allahabad.

From kindergarten through twelfth grade, Mr. Sharma attended a private Catholic school, called St. Joseph's College, in Allahabad. He was well-liked by his teachers, had responsibilities to maintain discipline, and was a prefect (a leader with responsibilities) from seventh grade until graduation; he was one of the longest-serving prefects in his class. He received multiple awards (including winning science competitions) and certifications, including for social and community service. During his high school years, he was involved in academics, sports (badminton and cricket), community and social service, and was an active leader with a group called Leadership Training Service, which was responsible for instilling leadership qualities in students from an early age. He graduated High School in the top 5% of his class. He has maintained contact with the school and is a well-respected alumnus. Mr. Sharma still plays badminton and volunteers to teach children how to play badminton in Minnesota.

---

[1] Some dates in this section are approximate.

Outside of school, Mr. Sharma spent a great deal of time studying, as academics was his parents' priority for him.  He was also part of a group of government officials and their families who used to regularly perform community service from a very early age.  Most of his childhood friends were either from school or children from other government families.

After graduating high school, Mr. Sharma worked for one year in a steel factory as a manufacturing planner, working 45 hours and 6 days per week.  He also used this year to study and prepare to go to college, which was very competitive.  The engineering college he sought admission to received approximately 300,000 applications yearly for fewer than 120 spots.  The application process consisted of multiple stages, including an entrance exam, interviews, and personality tests.  Ultimately, Mr. Sharma was accepted into six or seven schools, and he chose to attend the Manipal Institute of Technology and study Electrical and Electronics Engineering.  He graduated in May of 1995 with "First Class with Distinction with University Ranks" and in the top 20 students of his class, all of whom had their names inscribed on school walls.

Mr. Sharma wanted to continue with school to attain his MBA.  To do so, he had to have a least one year, and preferably two years, of work experience.  He already had one year working in the steel factory, so he obtained a job with a British software company that was expanding into India.  He worked in their office in Allahabad so he could live with his parents and save money.  During this year, he studied for the MBA exams.  Similar to his undergraduate application process, applying for graduate school was very competitive.  After the written exams, he had to engage in group discussions

4

(debates and presentations), complete a management aptitude assessment, and then be interviewed by the faculty. He also applied to approximately ten MBA schools in the United States and took the GMAT exam. He ultimately chose to study at Manipal again for his MBA, which was a two-year program. During the program, he completed a summer internship in New Delhi. After graduation, he had three job offers and chose a company based in California.

In November 1997 during his MBA program, Mr. Sharma met his wife, who was getting her degree in medicine in the same town. They dated for a couple months until he left to begin his work with the California company. She had two years of school left, and they kept in contact via phone calls, letters, texting, and visits. Mr. Sharma's first six months of work with the California company were completed in Calcutta, where he adjusted to the corporate culture, received training, made friends, and waited for Visa approval to come to the United States. When he received approval for the H-1 visa work permit program,[2] he traveled to California. The first month in California was spent getting acclimated to the culture and obtaining a driver's license, social security number, and so on. He stayed with this company for over a year and then worked for various other companies over the following years.

During this time, Mr. Sharma traveled back to India periodically both for work purposes and to see and marry his wife. She joined him in the United States in 2000 but returned to India in 2003 to give birth to their first child. His wife and baby remained in

---

[2] Mr. Sharma became a Naturalized U.S. Citizen in 2012.

India with Mr. Sharma's family for a few months, and Mr. Sharma would travel between the United States and India to visit.

For one year in the mid-2000s, the company for which Mr. Sharma worked obtained a contract with the United States Department of Defense and chose Mr. Sharma to lead the project. Mr. Sharma led 60–65 employees, successfully completing the project. After this project, Mr. Sharma was put in charge of a two-year project for the federal government, which called for his company to build an industrial consortium with other companies. Mr. Sharma was the overall consortium lead to build a piece of key technology for the United States Government.

In 2007, Mr. Sharma and his wife and son moved to Chicago so his wife could complete a one-year medical internship at the University of Chicago. They then moved to Minnesota after his wife's one-year internship completed so she could start her three-year residency in Minneapolis. Mr. Sharma continued with the same company during these years, in their Chicago and Minnesota offices, and he received promotions and increases in responsibility. Mr. Sharma and his family bought a house when they arrived in Minnesota and have lived there since.

Between 2009 and 2015, Mr. Sharma worked for different technology companies all of whom are some of the biggest names in technology, worldwide. In 2012, his wife and his son were vacationing in New Delhi when his wife suffered a stroke in the middle of the night. The entire right side of her body was paralyzed. For the following year, she was on disability and worked on her recovery. She was able to substantially recover except for some fine motor skills on her right side. She had been a practicing surgeon,

but had to change her practice to be non-surgical. Several years later, she was able to add some surgical procedures to her practice and remains an active doctor. Also in 2012, Mr. Sharma's mother passed away from multi-organ failure. In 2014, Mr. Sharma and his wife had their second son.

In 2015, Mr. Sharma started his first company called Crosscode with his own money. A couple years later, Crosscode was taken from Mr. Sharma in a way he believes was fraudulent, unlawful, and unfair. In 2019, his father passed away from organ failure. In June/July 2020, Mr. Sharma started his new company, KloudGaze, which is a software technology company.

In 2016, Mr. Sharma filed for his first patent, which was eventually awarded in 2019 and is globally enforceable. He earned his second patent, also globally enforceable, in August 2021. Mr. Sharma is in the process of filing his third global patent as part of the new technology platform he is building.

In February 2021, Mr. Sharma and his wife had an altercation, which resulted in Mr. Sharma being arrested. The case has been resolved with a continuance for dismissal, without a guilty plea and without a conviction (PSR, ECF No. 68, ¶ 44). Mr. Sharma and his wife have made amends, continue to live together, and continue to raise their two sons. Mr. Sharma is deeply remorseful about the incident, which was likely the result of extreme stress.

In mid-2021, Mr. Sharma started Neoforma, which is a health care platform with the ultimate goal of making affordable health care available to as many people as possible. Neoforma is already functional and has employees, an engineering team, and

technology. Mr. Sharma is in the process of selling KloudGaze and will seek permission to travel out of the country to complete the sale as well as to keep growing Neoforma worldwide.

Mr. Sharma lives at home with his wife and younger son, who is in private elementary school. His older son is in college in Indiana, studying business, and will be applying to business schools.

## **ARGUMENT**

The law on sentencing is well-settled. The Court is first to resolve any factual and legal disputes related to the PSR, calculate the statutory minimum and maximum sentences, and determine the corresponding sentencing guidelines range. *United States v. Feemster*, 572 F.3d 455, 460–61 (8th Cir. 2009). Next, the Court is to consider if a departure from the guidelines range is warranted. Finally, the Court is tasked with deciding whether a variance is necessary as it must impose a sentence that is "sufficient, but not greater than necessary" to achieve the statutory sentencing objectives. 18 U.S.C. § 3553(a).

Mr. Sharma's offense carries a base offense level of 7 and is increased by 2 levels for sophisticated means and 20 levels for the loss amount, and decreased by 3 levels due to acceptance of responsibility (PSR, ECF No. 68, ¶¶ 25–27, 34–35). The PSR calculated a criminal history category I (ECF No. 68, ¶ 41). With an adjusted offense level of 26 and a criminal history category I, there is a guidelines range of 63–78 months (PSR, ECF No. 68, ¶ 71).

Pursuant to statutes, Mr. Sharma is eligible for one to five years of probation (PSR, ECF No. 68, ¶ 76). Probation must include a fine, restitution, or community service (PSR, ECF No. 68, ¶ 76). While the guidelines do not suggest probation (PSR, ECF No. 68, ¶ 77), they are advisory and not mandatory.

I. **Mr. Sharma's 18 U.S.C. § 3553(a) Factors Warrant a Probationary Sentence**

    A. **The Nature of the Offense**

The guilty plea establishes Mr. Sharma obtained $1,773,600.00 in PPP loans he should not have received. He also applied for an additional $7,845,446.46 in PPP loans, which he did not receive. Mr. Sharma's offense occurred without any violence or threat of violence; he is not a danger to the community. Mr. Sharma is a first-time offender who made very serious errors in judgment and thereby violated the law.

    B. **Mr. Sharma's Characteristics**

From the time he was first confronted with his unlawful conduct, Mr. Sharma has admitted what he did wrong, taken full responsibility for it, and is trying to make amends as best he can.

    C. **The Need for Deterrence**

There are, of course, two types of deterrence: general and specific. The fact of Mr. Sharma's conviction will provide a strong message to others who would engage in similar conduct and thereby fulfill the legitimate sentencing aim of providing general deterrence. Any prison sentence Mr. Sharma receives will have limited impact in his particular case. This is because prison would have little <u>specific</u> deterrent value given his age and the consequences he has suffered thus far. "Prison is an important option for incapacitating

and punishing those who commit crimes, but the data show *long prison sentences do little to deter people from committing future crimes*" (emphasis added).[3] Evidence suggests "that short sentences may be a deterrent. However, a consistent finding is that increases in already lengthy sentences produce at best a very modest deterrent effect."[4]

First, research has shown that *being caught* is more of a deterrent than *punishment*.[5] Simply being caught and indicted is more of a deterrent to both Mr. Sharma and others than a long sentence. Second, prison sentences do not particularly deter future crime: "Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment."[6] Third, rather than punishment, any police presence that increases the chance of being caught is more of a deterrent than punishment.[7] Longer sentences can increase recidivism.[8] Fourth, increasing penalties does not generally deter crime because criminals often do not know what the penalty is for the crime they are committing.[9] Therefore, increasing penalties is not going to deter crime—it merely fills the prisons and eats up taxpayers' dollars.

---

[3] U.S. Department of Justice, National Institute of Justice, Five Things About Deterrence 2 (May 2016), https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.
[4] Id.
[5] Id. at 1.
[6] Id.
[7] Id.
[8] Id.
[9] Id.

10

## II. Restitution

Restitution and the actual loss amount consists of two loans obtained via Old National Bank ($474,900.00 and $736,200.00) and one loan obtained via Transportation Alliance Bank ($562,500.00). This totals $1,773,600.00.

Pursuant to the plea agreement (ECF No. 51, ¶ 17), Mr. Sharma has agreed that the following seized funds are subject to forfeiture:

$331,300 from Old National Bank (Account -1176)

$245,138.49 from Wells Fargo Bank (Account -8780)

$85,594.94 from Old National Bank (Account -6720)

$12,947.33 from US Bank (Account -6963)

**TOTAL:    $674,980.76**

After this amount ($674,980.76) is applied to the restitution, Mr. Sharma will owe $1,098,619.24. Mr. Sharma recognizes his obligation to pay restitution in the amount of $1,098,619.24 and will do whatever he can to pay the amount he owes as soon as he can. He reports that he has already obtained the required guarantees to make the payment.

## III. Specific Bases for Downward Departures and Variances for Mr. Sharma

### A. Downward Departure Basis: Loss Amount

One issue in this case is whether this Court should use the actual loss amount ($1,773,600) or intended loss amount ($9,619,046.46) to impose the loss enhancement under U.S.S.G. §2B1.1(b)(1). The difference in application is 4 levels and 22–27

months.[10]  Mr. Sharma reserved the right to argue that the actual loss amount applied (Plea Agreement, ECF No. 51, p. 9).  Pursuant to the comments to U.S.S.G. §2B1.1(b)(1), the "general rule" is that the "loss is the greater of actual loss or intended loss."  U.S.S.G. §2B1.1, comment. (n.3(A)).  Mr. Sharma withdraws his PSR objection regarding the loss amount; however, he moves the Court for a downward departure or variance because the intended loss amount and resulting guidelines range overstates the seriousness of Mr. Sharma's offense.  This is thus a basis for a downward departure.  U.S.S.G. §2B1.1, comment. (n.21(C)).

### B. Downward Variance Bases

#### i. The advisory guidelines range is too harsh, excessive, and "greater than necessary" in this particular case

Mr. Sharma has no prior criminal convictions.  He is facing a guidelines sentence of 63–78 months (PSR, ECF No. 68, ¶ 71).  For a 48-year-old man who has never been in serious trouble before, any amount of incarceration is life-changing.  The Supreme Court in *Pepper v. United States* stated:

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams*, 337 U.S. at 247, 69 S.Ct. 1079; see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime

---

[10] By using the intended loss amount, the total offense level is 26 with a range of 63–78 months.  By using the actual loss amount, the total offense level is 22 with a range of 41–51 months.

12

was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender"). 562 U.S. 476, 487–88 (2011). Mr. Sharma knows that what he did was wrong. He regrets his choices and actions, and he has accepted responsibility.

### ii. Stigma of a felony conviction

Mr. Sharma will be a life-long convicted felon, and that is enough punishment. "The stigma of a felony conviction is permanent and pervasive." *United States v. Smith*, 683 F.2d 1236, 1240, n.13 (9th Cir. 1982) (quoting *United States v. Glasgow*, 389 F.Supp. 217, 224–25 (D.D.C. 1975)). "Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed." *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012).

### iii. Mr. Sharma is unlikely to reoffend and poses no danger to the public

The likelihood that Mr. Sharma "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper*, 562 U.S. at 492. Mr. Sharma, upon completion of this case, will return to being a law-abiding, productive member of society. He will continue his career in business and technology and aspires to build transformative technology that will benefit humanity.

"It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose." *United States v. Edwards*, 595 F.3d 1004, 1016, n.9 (9th Cir. 2010) (quoting S.

13

Rep. No. 98-225, at 92). Any terms of probation will be onerous and will certainly be a sufficient punishment for Mr. Sharma.

### iv. Society will benefit more from Mr. Sharma working, supporting his family, and helping the community than his incarceration

As discussed below, society will shoulder a massive financial burden to incarcerate Mr. Sharma. A guidelines sentence would cost society approximately $232,344.00 to $287,664.00 if he is sent to prison. Society would benefit far more if Mr. Sharma remained at home, worked, continued to support himself and his family, created economic development, and generated employment. He reports that his new company, Neoforma, is already providing employment, has generated economic activity for the state and the country, is backed by a global investor base, and has plans to hire a substantial workforce, primarily in Minnesota, in 2022.

Mr. Sharma reports that he has substantial responsibilities in his household, which include caring for his 7-year-old son. He also reports that many of the basic household duties, such as cooking and the like, fall to him because of his wife's health. His wife, Dr. Sharma, had a stroke and Mr. Sharma reports her ability to participate in household tasks is somewhat limited. Mr. Sharma reports that Dr. Sharma is at a serious risk of a second stroke and needs regular and daily care, which is provided for by Mr. Sharma. Mr. Sharma is therefore very concerned about what would happen to his wife and son were he to be incarcerated. He respectfully requests the Court be mindful of these circumstances when fashioning his sentence.

### v. The Court's sense of what is fair and just

With a federal felony conviction, a fair and just sentence is probation. "Although the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). In this case, a merciful sentence of probation is fair and just.

## IV. Mr. Sharma's Acceptance of Responsibility

Mr. Sharma accepted full responsibility in this case. Mr. Sharma's first encounter with law enforcement authorities occurred at the airport where he was read a *Miranda* warning, waived his rights, and essentially confessed to the PPP crimes alleged in this case. Additionally, he pled guilty to the offense, and he made the following statement to the Probation Officer:

> Between April 2020 through November 2020 in the State and District of Minnesota, I fraudulently applied for at least $9,619,046.46 in COVID-19 pandemic emergency funding from 10 different lenders. I submitted 16 false and fraudulent applications to receive loan proceeds that I knew I was not entitled to receive. I obtained and misappropriated $1,773,600 in fraud proceeds. This violated Title 18, United States Code, Section 1343.
>
> I am extremely remorseful for my actions and choices. I offer no excuse for my decision to submit false and fraudulent applications for pandemic funds. I am very sorry.

V.  **Cost to Incarcerate Mr. Sharma**

> In 1984, at the start of my career, 188 people were imprisoned for every 100,000 inhabitants of the United States. Other Western industrialized countries had roughly equal numbers. By 2010 that figure had skyrocketed to 497 people imprisoned in the U.S. for every 100,000 inhabitants. Today, we imprison more of our people than any other country in the world.
>
> How did 'the land of the free and the home of the brave' become the world's biggest prison ward? The U.S. now houses 5% of the world's population and 25% of its prisoners. Either our fellow Americans are far more dangerous than the citizens of any other country, or something is seriously out of whack in the criminal-justice system. . . .
>
> ~U.S. District Judge Michael A. Ponsor[11]

Confirming Judge Ponsor's statement, statistics show that in the past few decades, the general prison population has soared:[12]



---

[11] Ponsor, Michael A., *The Prisoners I Lose Sleep Over*, THE WALL STREET JOURNAL (Feb. 12, 2014), available at https://www.wsj.com/articles/SB10001424052702304680904579365440971531708.

[12] The Sentencing Project, https://www.sentencingproject.org/wp-content/uploads/2021/06/US-prison-pop-1925-2019-1.png (citing Bureau of Justice Statistics) (last visited Feb. 17, 2022).

16

Compared to the rest of the world, as stated above by Judge Ponsor, the United States imprisons a shocking number of its citizens, showing that we imprison more people than Rwanda and Russia and far more than Spain, China, and India:[13]



Justice Kennedy made a similar statement to Judge Ponsor: "Our resources are misspent, our punishments too severe, our sentences too long. . . . [T]he sentencing guidelines are responsible in part for the increased terms. . . . [They] should be revised downward."  Statement of Justice Anthony Kennedy, ABA Annual Meeting (Aug. 9, 2003).

The PSR (ECF No. 68, ¶ 81) shows that the expense of putting an offender on probation pales in comparison to incarcerating that person:

|  | **Bureau of Prison** | **Community Corrections** | **Supervision by Probation** |
|---|---|---|---|
| **Daily** | $121.00 | $98.00 | $12.00 |
| **Monthly** | $3,688.00 | $2,980.00 | $371.00 |
| **Annually** | $44,258.00 | $35,761.00 | $4,454.00 |

---

[13] Id. at https://www.sentencingproject.org/wp-content/uploads/2021/05/intl-rates.png (citing Institute for Crime & Justice Policy Research) (last visited Feb. 17, 2022).

If Mr. Sharma is sentenced to 63 months (the low end of the guidelines range)—5.25 years—the United States will spend approximately $232,344.00 if he is sent to prison. If Mr. Sharma is sentenced to 78 months (the high end of the guidelines range)—6.5 years—the United States will spend approximately $287,664.00 if he is sent to prison.

Pursuant to statutes, Mr. Sharma is eligible for 1 to 5 years of probation (PSR, ECF No. 68, ¶ 76). A probationary sentence of 60 months—5 years—will cost the United States approximately $22,260.00.

## CONCLUSION

For the foregoing reasons, Mr. Sharma respectfully submits that a sentence of probation would be sufficient but not greater than necessary to achieve all legitimate aims of sentencing under 18 U.S.C. § 3553(a).

Respectfully submitted,

**RYAN GARRY, ATTORNEY, LLC**

Dated: February 23, 2022

s/ Ryan Garry
Ryan P. Garry (Attorney No. 0336129)
Elizabeth R. Duel (Attorney No. 0393619)
Attorneys for Defendant
333 South Seventh Street, Suite 2350
Minneapolis, MN 55402
Phone: (612) 436-3051
Fax: (612) 436-3052
ryan@ryangarry.com | elizabeth@ryangarry.com

**BIRRELL LAW FIRM, PLLC**

Andrew S. Birrell (Attorney No. 133760)
Attorneys for Defendant
333 South 7th Street, Suite 2350
Minneapolis, MN 55402
Phone: (612) 238-1939
andy@birrell.law