UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-261 (DSD-TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **GOVERNMENT'S POSITION** |
| | ) | **REGARDING SENTENCING** |
| ADITYA RAJ SHARMA, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Charles J. Kovats, Jr., Acting United States Attorney for the District of Minnesota, and Matthew S. Ebert and Jordan L. Sing, Assistant United States Attorneys, hereby submits this position paper as to sentencing factors.  The government respectfully requests that the Court sentence defendant Aditya Sharma to a term of imprisonment of 70 months, which is the midpoint of the applicable Guidelines range.  Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing in light of Sharma's characteristics and conduct, which included lying repeatedly and brazenly as part of his $9.6 million scheme to defraud the Paycheck Protection Program of funds intended for eligible small businesses battered by the COVID-19 pandemic.  Such a sentence also sends a much-needed deterrent message, particularly given Sharma's repeated demonstrations that he lacks respect for the law.

I.   **DEFENDANT SHARMA'S $9.6 MILLION SCHEME TO DEFRAUD COVID-19 RELIEF FUNDS**

In 2020, as the COVID-19 pandemic engulfed the country and devastated the health and economic well-being of millions of Americans, the United States government implemented various measures to aid struggling workers and small businesses. Chief among these vital life-lines to the American economy was the Coronavirus Aid, Relief, and Economic Security ("CARES") Act enacted in March 2020, which included forgivable loans to small businesses to help pay payroll costs, rent, utilities, interest on mortgages, and other permissible business expenses, through a program referred to as the Paycheck Protection Program ("PPP").

For many small businesses and their employees, the PPP was a critical source of funding that enabled businesses harmed by the pandemic to stay afloat. However, for unscrupulous and opportunistic fraudsters, like Sharma, the PPP was a lucrative way to amass fraudulent proceeds, at the expense of American taxpayers and to the detriment of deserving, hard-hit small businesses. From at least April 2020 through November 2020, Sharma lied and defrauded—repeatedly and audaciously—with the intent to steal PPP funds for his own benefit and enrichment. (PSR ¶¶ 15-17.) He capitalized on the COVID-19 pandemic to exploit emergency funding for needy, eligible small businesses by knowingly submitting *sixteen* false and fraudulent applications to receive loan proceeds that Sharma knew he was not entitled to receive. (*Id.* ¶ 17.) Sharma applied for at least $9,619,046.46 in such loans from ten different lenders, of which he obtained and misappropriated $1,773,600 in fraud proceeds. (*Id.*)

Sharma submitted these sixteen applications with numerous knowingly false representations, examples of which include the following:

- Fraudulently submitting at least one loan application in the name of Sharma's wife without her knowledge or approval (*Id.* ¶ 16);

- Submitting falsified supporting documentation, such as forged tax return documents or bogus bank account statements that Sharma created (*Id.*);

- Falsifying the number of active employees on payroll and including bogus monthly payroll figures to deceive lenders about the eligibility of Sharma's businesses (*Id.*);

- Misrepresenting information to qualify under PPP loan requirements, such as corporate details and dates of incorporation to make it appear as though Sharma's entities—"Kloudgaze," "Neoforma," and "Mokume"—had been operational as of February 15, 2020, and thus potentially eligible for PPP funding when, in fact, Sharma created these entities after the PPP funding was authorized by law (*Id.*);

- Surreptitiously applying for a PPP loan in the name of "Crosscode Inc., dba Kloudgaze," even though Sharma knew he had no authority to take action on behalf of Crosscode, and Crosscode never did business under the name "Kloudgaze."[1]

- Concealing from lenders that Sharma had previously applied for or received other PPP funding in order to stave off lenders' inquiries and to enable Sharma to unlawfully "double dip" into PPP funds by receiving a PPP loan for $474,900 for "Crosscode d/b/a Kloudgaze" on July 16, 2020, and receiving another PPP loan for $736,200 for Mokume on July

---

[1] Crosscode, a cloud-based software development company originally headquartered in Maple Grove, Minnesota, was founded by Sharma in 2015. (PSR ¶ 8.) After Sharma subsequently held various positions at Crosscode, including Chief Executive Officer and President, he was notified on or about November 13, 2019, that—effective immediately—Crosscode's board of directors had removed him as an officer of Crosscode and terminated his employment for cause. (*Id.*); (Dkt. 68, Plea Agm't at 2-3.) Specifically, the Crosscode board had concerns about Sharma's performance and his failures to comply with agreements. (PSR ¶ 8.) In addition, a review of company records revealed that Sharma fabricated Crosscode's bookings and accounts receivable, and falsified the company's revenue and bank statements. (*Id.*)

26, 2020, even though Sharma had already received a PPP loan for $562,500 on April 29, 2020 (*Id.* ¶ 15).

Due to Sharma's various material falsehoods and omissions, between April and July 2020, two lenders approved three of Sharma's PPP applications and deposited $1,773,600 in PPP funds into bank accounts that Sharma opened and controlled. (*Id.* ¶¶ 15, 17.) Sharma subsequently transferred the $1,773,600 in fraud proceeds to various other bank accounts for the purpose of converting the money for his personal benefit in violation of PPP requirements. (*Id.* ¶ 15.) Sharma transferred at least $900,000 to personal bank accounts that he controlled, including, among other unauthorized personal expenditures, to: (a) cover approximately $260,226 of Sharma's unrelated legal debts; (b) pay for home improvements to Sharma's Maple Grove residence, including the installation of a $64,300 pool in Sharma's backyard and landscaping projects totaling $24,600; (c) transfer approximately $14,000 to a financial account in India; and (d) otherwise spend PPP money as seed money for other new business ventures. (*Id.* ¶ 18.)

As a result of his Sharma's criminal conduct, on November 13, 2020, he was arrested pursuant to an indictment charging him with wire fraud. That same day, federal agents contemporaneously executed a search warrant at Sharma's residence and executed seizure warrants to obtain the following fraud proceeds from Sharma's bank accounts:

a.   $331,300 in funds seized from Old National Bank account x1176 in the name of Mokume, LLC;

b.   $245,138.49 in funds seized from Wells Fargo Bank account x8780 in the name of Kloudgaze, Inc.;

4

    c.    $85,594.94 in funds seized from Old National Bank account x6720 in the name of Kloudgaze, Inc.; and

    d.    $12,947.33 in funds seized from US Bank account x6963 in Sharma's name.

## II.   PSR AND THE ADVISORY GUIDELINES RANGE

### A.  <u>Sentencing Range</u>

As set forth in the PSR, the base offense level for wire fraud is 7, pursuant to U.S.S.G. § 2B1.1(a)(1). (PSR ¶ 25.)

Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), the offense level is increased 20 levels because his intended loss, $9,619,046, is more than $9,500,000 but less than $25,000,000. Sharma readily concedes that $9,619,046 is the fraudulent loss that he purposely intended to receive. (*See* PSR ¶ 21) (where, in his written statement, Sharma acknowledged, "I fraudulently applied for at least $9,619,046.46 in COVID-19 pandemic emergency funding … I submitted 16 false and fraudulent applications to receive loan proceeds that I knew I was not entitled to receive.") Under the Guidelines, the district court must "make a reasonable estimate of the loss" by considering "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n. 3(A), (C). Intended loss is "the pecuniary harm that the defendant purposely sought to inflict," *id.* § 2B1.1, cmt. n. 3(A)(ii), and it includes actual losses suffered, *see United States v. Ware*, 334 F. App'x 49, 50 (8th Cir. 2009) (per curiam).

Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), the parties agree that Sharma's offense level is increased by 2 levels because Sharma's fraud involved sophisticated means

(i.e., multiple entities, including shells, fictitious records, etc.).  (Dkt. 68, Plea Agm't ¶ 27.)

Thus, the advisory sentencing guideline range, with acceptance of responsibility, is 63-78 months of imprisonment.  (PSR ¶ 71.)

### B.   <u>Restitution</u>

The parties (and the PSR) agree that Sharma owes restitution in the amount of $1,773,600.  (Dkt. 68, Plea Agm't ¶ 11; PSR ¶ 82.)   Of that amount, Sharma owes $562,500 to one defrauded lender.  The remaining $1,211,100 that Sharma owes to a second lender is instead now owed to the U.S. Small Business Administration.  More specifically, the Small Business Administrator for the second lender has confirmed that Sharma did not provide the normal borrower payments and thus did not pay off the two loans totaling $1,211,100.  Once the second lender determined that Sharma's loans were fraudulent, they received a loan guarantee from the U.S. Small Business Administration as part of the procedures of the PPP.  In response to the default caused by Sharma's fraud, the U.S. Small Business Administration paid off the $1,211,100 in Sharma's fraudulent loans.   As a result, Sharma owes $1,211,100  to the U.S. Small Business Administration as well as $562,500 to the other defrauded lender.  This brings Sharma's total restitution obligation to the agreed-upon amount of $1,773,600.  (Dkt. 68, Plea Agm't ¶ 11; PSR ¶ 82.)

Moreover, pursuant to the Plea Agreement, Sharma agrees and understands that the $674,980.76 in funds seized in November 2020 by the government (which Sharma agrees constitute or are traceable to his wire fraud scheme) shall not be

6

treated as satisfaction of any restitution ordered by the Court.  (Dkt. 68, Plea Agm't ¶ 17-22.)

## III.   SENTENCING FACTORS

The government respectfully asserts that a sentence of 70 months' imprisonment is appropriate.  The sentencing factors under 18 U.S.C. § 3553 most pertinent to this case—namely, (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; and (3) the need for the sentence to promote respect for the law and to afford adequate deterrence—are addressed below.

### A.   The Nature and Circumstances of Sharma's Offense Warrant a Sentence of 70 Months.

Sharma's crime is particularly significant considering the massive fraud loss he sought to inflict during a time of significant national need.  He attempted to receive more than $9.6 million in PPP loans, and actually defrauded the PPP of approximately $1.7 million.  (PSR ¶ 17.)  And an intended loss of over $9.6 million is not just large in the context of fraud cases involving the CARES Act—it is a large loss in the context of all fraud cases.  To frame Sharma's fraud in a national context, his loss amount alone makes this an exceptionally serious and significant crime.  In fiscal year 2020, federal district courts nationwide applied the fraud Guideline 4,449 times. *See* United States Sentencing Commission, Use of Guidelines and Specific Offense Characteristics, at 9–10, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application frequencies/ Use_of_SOC_Guideline_Based.pdf.  Of those, only 76 involved a fraud loss over $9.5

million.  (*Id.*)  In other words, Sharma's offense is in the rarified 2% of nationwide federal fraud offenses nationwide involving such a significant amount at issue.  The fact that Sharma's criminality exploited a national crisis simply renders it all the more aggravating.  Sharma's sentence should therefore reflect the very serious nature of his offense.  *See* 18 U.S.C. § 3553(a)(2)(A).

Sharma's fraud reveals not only his greed but also a pronounced callous disregard for others.  For example, knowing full well that pandemic emergency funds were scarce and ear-marked for those truly in need, Sharma tried to line his pockets with $9.6 million on the taxpayers' dime.  Sharma then shamelessly engorged himself on $1.7 million in fraudulent proceeds meant for those struggling small businesses to pay employees.  He did so with no regard for the harm wrought by his crime.  For example, Sharma knowingly hijacked the name of his former company, Crosscode, to pursue his fraudulent ends.  Sharma's conduct, among other harms, actively prohibited Crosscode from seeking legitimate pandemic relief—as an entity can seek only one PPP loan.  (*See* Dkt. 92, Victim Impact Statement by Crosscode.)  Sharma's disregard for others while seeking his own fulfillment extended even to his own wife, whose name and identity Sharma shamelessly misappropriated in one of his fraudulent applications without her knowledge or consent.  (PSR ¶ 16.)

Given the magnitude of his fraud, the sheer number of lies on his multiple fraudulent applications, and the manner in which he committed his fraud, a substantial term of imprisonment is warranted.  The government respectfully asserts that a prison term of 70 months will reflect the seriousness of Sharma's offense.

**B.** **A Guideline-Range Sentence of 70 Months Appropriately Reflects Sharma's History and Characteristics.**

Sharma's history and characteristics offer nothing that might mitigate his criminal conduct and, instead, they highlight an individual driven by greed.  Sharma has benefited from significant opportunities in life.  He enjoyed the benefit of a good upbringing with a supportive family.  (PSR ¶¶ 47-49.)  The son of a high-ranking government official in India, Sharma participated in sports as a youth and went on to successfully graduate from high school.  (*Id.* ¶¶ 47, 49.)  Sharma graduated from college with a Bachelor of Engineering degree, followed by a master's degree. (*Id.* ¶¶ 49, 58.)  Approximately twenty years ago, Sharma married his wife, a physician, and they emigrated from India to the United States.  (*Id.* ¶ 50.)  What followed was a series of lucrative employment positions for Sharma in computer technology:  IBM, Computer Science Corporation, and Microsoft.  (*Id.* ¶¶ 63-66.)  In addition, Sharma has a number of patents in the technology field.  (*Id.* ¶ 66.)  These professional and academic achievements all demonstrate that Sharma possesses positive characteristics, including intellect and drive, when he chooses to channel them lawfully.

To be clear, Sharma had every opportunity to succeed through honest work, and Sharma certainly did not initiate his fraudulent scheme in response to economic hardship.  Recent tax filings reveal that Sharma has earned annual adjusted income, together with his spouse, as follows:  $524,587 (2017), $1,262,795 (2019), and $1,732,069 (2020).  (*Id.* ¶ 68.)  Clearly, Sharma affirmatively chose dishonesty and fraud—not to avoid deprivation—but to use taxpayer money to pay his legal bills,

9

finance a backyard pool, and ostensibly to have the public subsidize his next business venture.  (*Id.* ¶ 18.)

It is significant and revealing that Sharma committed this crime without the usual financial hardships or lack of opportunities that might cause some to resort to crime.  *See, e.g., United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) (noting that district court considered that "[w]hile many criminals commit crimes from lack of opportunity and desperation, [defendant] acted out of greed.").  As Judge Posner aptly noted about defendants like Sharma:

> … no "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.  (Citation omitted.).  It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

That Sharma certainly had the education, training, and means to live beyond what many could imagine, without resorting to crime, makes his $9.6 million fraud all the more aggravating.  The government respectfully submits that a sentence of 70 months will account for Sharma's history and characteristics.

**C.    A Guideline-Range Sentence of 70 Months Appropriately Reflects the Need for the Sentence Imposed to Afford Adequate Deterrence and Promote Respect for the Law.**

A substantial guideline-range sentence is appropriate to afford specific and general deterrent and to promote respect for the law.  Despite generally admitting to

his conduct and lacking a criminal history, Sharma has struggled to abide by his most basis release conditions, which makes plain that he requires clear deterrence given his lack of accountability and his disrespect for the law.

In February 2021, while on pretrial release in this case, Sharma's minor son called the police to report that Sharma had assaulted his wife.  (PSR ¶ 44.)  This abuse by Sharma included:  twice slapping her face, grabbing her hair, pushing her head into a wall, throwing her to the ground, and hitting the back of her head multiple times. (*Id*.)  Sharma's wife reported to responding officers that Sharma threatened to kill her and that his behavior is unpredictable when he is intoxicated.  (*Id*.)  During an on-site interview with officers, Sharma admitted to assaulting his wife, and the event unfortunately was witnessed by Sharma's two sons (then aged 7 and 18).  (*Id*.) Sharma's resulting domestic assault and disorderly conduct charges violated not just the law, but also his pending pretrial release conditions, which resulted in a Petition for Action by U.S. Probation in March 2021 that, among other things, required Sharma to report any future contact with law enforcement within 72 hours to U.S. Probation.  (Dkt. 35.)

Just six months later, Sharma again violated his release conditions.  (Dkts. 73, 74, 75.)  As detailed in U.S. Probation's 11/24/2021 Violation Report, Sharma was served a Harassment Restraining Order because he repeatedly harassed a woman throughout August and September 2021—just after he pled guilty in this case.  (Dkt. 73.)  Attached as Exhibit 1 to the government's sentencing position is the victim's Harassment Restraining Petition (and resulting Order) that triggered the U.S.

11

Probation 11/24/2021 Violation Report.  The details of Sharma's harassment are disturbing and clearly demonstrate that he has not been meaningfully deterred by this prosecution.  (*See* Ex. 1.)  Despite unequivocal statements from Sharma's victim that she wanted him to leave her alone, Sharma repeatedly persisted in invading the woman's life.  (*Id*.)  In doing so, just weeks after pleading guilty before this Court in July 2021, Sharma specifically mischaracterized and minimized his pending criminal fraud case in his efforts to victimize someone else.  (*Id*.)  Specifically, his victim's no-contact petition notes that Sharma told his victim repeatedly in September 2021 that "his federal case was finished and he was no longer under any legal action" that should prevent her from "enter[ing] into a relationship with him."  (*Id.*)  Sharma thereafter "continued to try to convince [her] that his federal case was resolved and there was no reason for [her] to refuse [Sharma] anymore."  (*Id*.)  Sharma's conduct once again violated his release conditions, which required him to be admonished before the Court on November 24, 2021, and to have his conditions modified accordingly (Dkts. 73, 74, 75, 80, 81).

This is a troubling record.  Sharma knowingly disavowed the impact of this prosecution *in furtherance* of additional unlawful conduct, which, in turn, violated his release conditions.  His conduct while on release raises the real concern that Sharma has not learned from his actions and has not acquired any respect for the law and that, consequently, he might resort to more (and worse) crime if he does not receive a sufficient punishment.

Moreover, the fact of his $9.6 million fraud scheme further requires a lengthy sentence because the message must be amplified generally to deter any other party like Sharma that such crimes will be met with a severe sanction.   White-collar criminals, like Sharma, "act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Warner*, 792 F.3d 847, 860–61 (7th Cir. 2015).  They are, therefore, "prime candidates for general deterrence."  *Id*. at 860 (quoting *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013)).  *See United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (noting that "economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity") (quotation omitted); *see also United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2010) ("White collar crime . . . usually requires a well-schooled, intelligent criminal, capable of gauging the upside of how others will be gulled by his well-honed fables. This ability to foresee extends also to the possible downside of his fraud: apprehension, conviction, and punishment.").

If Sharma's conduct is not punished adequately, it encourages the like-minded to weigh the rewards with the risk of apprehension and punishment and to conclude ultimately that a fraud offense like Sharma's remains worth it.   However, a substantial sentence here will help disabuse the like-minded of that flawed notion. Given his ongoing actions, a downward departure or low-end sentence would miss the mark and only incentive Sharma and others to engage in fraud.  For these reasons, a

significant guideline-range sentence of 70 months is necessary to achieve the goals of deterrence and to promote respect for the law.

## IV.   CONCLUSION

For the reasons set forth above, the government respectfully recommends that the Court sentence defendant to a 70-month term of imprisonment and order him to pay mandatory restitution in the agreed-upon amount of $1,773,600.

Dated:  February 23, 2022

Respectfully submitted,

CHARLES J. KOVATS, JR.
Acting United States Attorney

*/s/ Matthew S. Ebert*
BY: MATTHEW S. EBERT
JORDAN L. SING
Assistant U.S. Attorneys

14