```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3    -------------------------------------------------------------
                                    )
 4                                  )
          United States of America, )      File No.: 20-CR-261
 5                                  )              (DSD/TNL)
                   Plaintiff,       )
 6                                  )
          vs.                       )      Courtroom 14W
 7                                  )      Minneapolis, Minnesota
          Aditya Raj Sharma,        )      Wednesday, March 9, 2022
 8                                  )      1:37 p.m.
                   Defendant.       )
 9                                  )
      -------------------------------------------------------------
10

11            BEFORE THE HONORABLE DAVID S. DOTY
          UNITED STATES DISTRICT COURT SENIOR JUDGE
12                      SENTENCING HEARING

13    APPEARANCES
          For the Plaintiff:        Matthew Ebert, Esq. and
14                                  Jordan Sing, Esq.
                                    United States Attorney's Office
15                                  600 United States Courthouse
                                    300 South Fourth Street
16                                  Minneapolis, Minnesota 55415

17        For the Defendant:        Andrew Birrell, Esq.
                                    and Ian Birrell, Esq.
18                                  Birrell Law Firm, PLLC
                                    333 South Seventh Street
19                                  Minneapolis, Minnesota 55402

20                                  Ryan Garry, Esq.,
                                    Ryan Garry, LLC
21                                  333 South Seventh Street, 2350
                                    Minneapolis, Minnesota 55402
22

23        Also Present:            Crystal Smith, Probation.

24        Court Reporter:          BRITTANY K. BLESENER, RPR
                                   300 South 4th Street
25                                 Minneapolis, MN 55415
```

```
1                        P R O C E E D I N G S
2            THE CLERK:  All rise.  The Honorable David S. Doty
3   now presiding.
4            THE COURT:  Good afternoon.  Do you want to take your
5   seats, please.  This afternoon we have on our docket the matter
6   of the United States vs. Adit- -- I think I had trouble with it
7   the first time -- Aditya Raj Sharma.
8            And may I have appearances, please.
9            MR. EBERT:  Good afternoon, Your Honor.  Matthew
10  Ebert and Jordan Sing on behalf of the United States.
11           THE COURT:  Good afternoon.
12           MR. BIRRELL:  Good afternoon, Your Honor.  Andrew
13  Birrell and Ryan Garry with Mr. Sharma, who is present before
14  the Court.
15           THE COURT:  And the people behind you want to be
16  shown on the record?
17           MR. BIRRELL:  This is Ryan Garry (indicating) and
18  this is Steve --
19           THE COURT:  Make sure you talk -- you don't have your
20  mic on.  I'm not sure the court reporter can hear you, but I
21  can't, so....
22           MR. GARRY:  Good afternoon, Your Honor.  Ryan Garry.
23           THE COURT:  Thank you.
24           MR. IAN BIRRELL:  And Ian Birrell as well, Your
25  Honor.
```

1          THE COURT:  All right.  Thank you very much.

2          This has been set as a sentencing, and I'm going to

3    continue with the COVID protocol.  You don't have to put your

4    mask on, but stay where you are.  We'll use the state court

5    system where you sit and talk from your seat.

6          Who is going to -- Mr. Birrell, are you going to be

7    doing the workup on behalf of Mr. Sharma?

8          MR. BIRRELL:  Yes, I am, Your Honor.

9          THE COURT:  Go ahead, please.

10         MR. BIRRELL:  Well, Your Honor, firstly, as to the

11   PSR objections, the only remaining objections are factual

12   objections that don't bear on the guideline range.  We laid

13   them on page two of our filing --

14         THE COURT:  Right.

15         MR. BIRRELL:  -- ECF 91, and we offer them only for a

16   complete and correct record.  The guidelines range is agreed

17   upon, so I don't have anything further on that.

18         THE COURT:  All right.

19         MR. BIRRELL:  Shall I continue?

20         THE COURT:  Yes, please.

21         MR. BIRRELL:  Okay.  Thank you.

22         Well, Your Honor, Mr. Sharma is a 48-year-old man

23   with no prior convictions.  Until about age 44, it looks like

24   from all of the records, he led an exemplary life.  He grew up

25   in India.  He had a good family.  He worked hard at school.  He

1    was liked and respected by his peers and teachers.  He got a

2    bachelor's degree in engineering, completed a post-graduate

3    diploma in management, then he left his home country to come to

4    the United States.

5          He became a permanent U.S. resident in 2005, became a

6    United States citizen in 2012.  He got married and is still

7    married.  He raised his son with his wife who's in college, and

8    they have a son, who I believe is 7, at home.

9          He worked, we can see, for top tier companies,

10   including IBM and Microsoft.  Apparently he has a number of

11   patents in his field.  He started a company called KloudGaze,

12   became embroiled in a bitter corporate fight.  He believes his

13   company was unlawfully taken from him.  There is ongoing civil

14   litigation.  There was a bankruptcy proceeding.  I noted there

15   was a letter filed by Mr. Rahul Gandhi, requesting the court

16   impose $911,031.20 as a restitution obligation on Mr. Sharma in

17   favor of Crosscode and CodeLogic to pay for legal and

18   bankruptcy fees.  Of course, this request is inappropriate and

19   we object to it.  I mention it to further illustrate the

20   rancorous nature of this litigation and Crosscode's apparent

21   efforts to improperly use the criminal process to its unfair

22   advantage.

23         About the case, Judge, Mr. Sharma absolutely admits

24   he unlawfully applied for PPP loans.  He admits he did exactly

25   what the Government says he did.  He admitted this to the FBI

1    the first time he was asked about it at the airport.  He has

2    never denied what he did.  He waived his procedure on

3    constitutional rights and pled guilty, and he agreed to make

4    restitution.

5            In trying to help understand what happened, I note

6    the PSR provides some information in paragraphs 54 and 56,

7    which confirm that medical records show Mr. Sharma suffers from

8    depression, from anxiety, and records show his severe alcohol

9    use dependency.  And as the Government repeatedly points out,

10   we see marital friction that led to his arrest in state court.

11   We also see, Your Honor, that his family continues to support

12   him.

13           These circumstances, Your Honor, are not offered as

14   an excuse for his conduct.  They are hopefully providing some

15   understanding.  They show not, as the Government suggests, a

16   man fatally flawed and beyond redemption, but instead they show

17   a man who worked too long, too hard, and under too much stress,

18   and lost control of himself and went off the rails.

19           Mr. Sharma is a man who committed a serious crime,

20   but who is not beyond redemption.  He's 48 years old, Your

21   Honor.  He has a lot of life left, and there is a pathway

22   forward for Mr. Sharma, which we hope the Court will see.

23           Thank you.

24           THE COURT:  All right.  Thank you.

25           Mr. Sharma, you get a chance to address the Court now

1   also, if you wish.  Anything you'd like to say would be fine.

2   You know, your attorneys are very good attorneys, as you know,

3   they spoke well of you, but whatever you'd like to say is fine

4   here this afternoon.  Go ahead.

5              THE DEFENDANT:  Sure, Your Honor.

6              THE COURT:  Make sure your mic is on.  You don't have

7   to stand.  Again --

8              MR. BIRRELL:  Excuse me.  Let me help you with your

9   mic.  Just a second.  It's not intuitive (indicating).  There

10  you go.

11             THE COURT:  Thank you.

12             THE DEFENDANT:  Thanks so much, Your Honor, and I

13  hope I'm audible.

14             So Your Honor, my lawyers did make me understand that

15  I'll have a right to say whatever I wish to say, and I did my

16  own research.  I'm fairly well educated and did my own research

17  on what typically happens on these proceedings.  Your Honor,

18  before I say anything, I just want to let you know that

19  whatever I'm going to say in front of you is from the heart.

20  I've not prepared anything.  Yes, I've written down a few

21  notes.  I've not prepared any script.  I've not prepared any

22  speech.  And needless to say, Your Honor, neither have I

23  rehearsed anything.  I was even told to stand up in front of

24  the mirror and, you know, rehearse before I stand in front of

25  you, but that's not what I've done.  So I'm going to be

1   speaking from the heart, and I'm going to lay open a lot of

2   facts.  And I look upon your wisdom and your guidance to help

3   understand what needs to happen next.

4          Before I say anything, I would like to start off with

5   an apology, Your Honor.  I fully, fully admit what I did was

6   incorrect, was wrong.  I'm remorseful, but it doesn't define

7   who I am.  It doesn't define my character.  This was my life's

8   first mistake, Your Honor, my life's first mistake.  I'm

9   extremely, extremely sorry, extremely repentful [sic], and I

10  can assure you it will never happen again.

11         Now, going on, Your Honor, I had the chance to read

12  all of the documents, all the filings in this case, and Your

13  Honor, that's where I want to start off with a few things.

14  Every single document that -- and I'm not trying to point any

15  fingers here.  In our culture we have been taught that when,

16  you know, somebody goes low, you need to go high.  I'm not

17  going to resort to the slander that I've seen coming out in

18  each and every document, every single document that has been

19  filed, including the last two by the respectable prosecution

20  here.  It's nothing but slander, nothing but slander.

21         But Your Honor, while I'm not going to resort to the

22  same low levels, but what bothers me, what hurts me, is when

23  falsehoods and inaccuracies are presented to the Court here,

24  Your Honor, and I believe it is my right, it is my duty, to

25  bring these inaccuracies and these falsehoods to your

1    attention.  And there are lots and lots of them, Your Honor,

2    lots and lots of them.  I'm not going to pick up each one of

3    them -- and I've come prepared fully with evidence to back up,

4    you know, what I'm saying -- but I'm just going to hit on some

5    of the key and some of the most important falsehoods and

6    inaccuracies which have been submitted to you.  I don't know

7    what is the motivation, but to me, it's serious, it's serious.

8           To start off with, Your Honor, in the most recent

9    filing by the Government there has been a comment which has

10   been made to my most recent company, Neoforma.  And there has

11   been a comment that has been made that Neoforma has been set up

12   with the proceeds of crime, yada, yada, yada, so on and so

13   forth.  Your Honor, I want to submit a few documents, and with

14   copies to the prosecution as well --

15          Andy?  Andy?  Andy, can you give these to the

16   honorable judge?

17          MR. BIRRELL:  Does the Court wish to receive them?

18          THE COURT:  Well, I'm not going to receive them into

19   evidence today.

20          THE DEFENDANT:  Okay.

21          THE COURT:  That's not the purpose of what we're

22   doing here.

23          THE DEFENDANT:  Sure.

24          THE COURT:  The purpose really is for you to explain,

25   mitigation, if you're inter- -- that sounds like where you're

1   going with this.

2              THE DEFENDANT:  Sure.

3              THE COURT:  You don't have to file documents.

4              THE DEFENDANT:  Okay.

5              THE COURT:  This is not an evidentiary hearing.

6              THE DEFENDANT:  Okay.  That's fine.  So I'll refrain

7   from submitting any documents, but Your Honor, facts are fully

8   with me.

9              This is, you know, an inaccuracy.  Neoforma, The

10  Secretary of State's incorporation document says it was

11  incorporated on the 2nd of March, 2021.  The bank accounts and

12  the funding documents of Neoforma, contrary to what has been

13  submitted to you that it has -- the company was funded by

14  proceeds of crime, Your Honor, I have broken down my retirement

15  savings to fund the companying, and those banking transactions,

16  everything is here with me.

17             The prosecution has made another falsehood, which I

18  don't know why it was made, but they have claimed that there is

19  no guarantee that restitution would ever be paid.  Your Honor,

20  $550,000 of my real estate property is into lien.  We have

21  given a written guarantee to the prosecution's office dated

22  December 8 to Ms. Quinn Hochhalter -- I hope I'm pronouncing

23  her name right -- and this guarantee was submitted by the

24  chairman of the board of my current company, KloudGaze, which

25  has been acquired, today as we speak, by a very leading global

1    technology company, and it has been very clearly mentioned in
2    the guarantee letter that the restitution would be paid by the
3    company because the company's banking records and financial
4    transactions, they all indicate that full 100 percent of the
5    amount was used for the operation of the company, contrary to
6    what the Government would like us to believe that money went
7    into my personal pockets.  That is absolutely falsehood, Your
8    Honor, absolutely falsehood.
9            And the board of directors gave a clear undertaking
10   that this amount has been recorded into the books of the
11   company as a liability, and the buyers who have bought the
12   company would want a zero liability company, so we are
13   required, we are mandated by law, to make the first payment to
14   the Government, there was a restitution, before a single penny
15   can be paid to the shareholders.
16           Your Honor, I'm not at liberty to disclose neither
17   the amount of acquisition nor who the potential buyer is
18   because we are under some strict ideas which are enforceable,
19   not just in the U.S. but outside too, but the transaction
20   amount is very, very -- it's a huge amount, it's a huge amount,
21   as close to nine figures as it can get.  So the first right of
22   that payment from the nine figure payment will be coming to the
23   Government.  And this guarantee has been submitted, like I
24   said, on a letter dated December the 8th.
25           Your Honor, there has been a lot of other slanderous

1   campaigns and, you know, right from the get-go, Your Honor,

2   right from the get-go, I had made my position very clear, that

3   I have made a mistake and I'm going to do everything in my

4   power to fix that mistake, every single thing in my power to

5   fix that mistake.  I laid open my heart.  I gave all the

6   evidence to the Government right from the first day to every

7   single time they asked me.

8          As a matter of fact, we even requested the Government

9   that, you know -- and Mr. Ebert will not deny it because he was

10  present with at least six other of his -- of his colleagues in

11  the month of January of 2021, about 15 months ago, where, once

12  again, these allegations were coming in that I made improper

13  profit from these funds, and I completely dispute that.  I

14  disagree that even to date.  And I told Mr. Ebert, "Mr. Ebert,

15  we'll give you the financial transactions of the company.

16  We'll give you all the access to the company's accounting

17  systems," right then and there myself.  "Here is my user ID,

18  here is my password.  You can go through each of the

19  transactions and you will see that there was an accounting

20  error."

21         Your Honor, I believe in setting good and high

22  standards for my company.  I strongly believe that the buck has

23  to stop with me.  If I am the leader of my company, the

24  mistakes, the actions, the inactions of not just my employees,

25  but of the company, they have to rest with me.  My accountant

1  made a very simple accounting error, a very, very simple

2  accounting error, which was translated into a slander campaign.

3          Your Honor, no amount of incarceration would be

4  bigger than the slander campaign which has been based on

5  falsehoods and inaccuracies that me, my family, my children

6  have gone through over the last 18, 20 months now.  And I ask

7  you, Your Honor, in your own wisdom, which investigator would

8  not want to dig into the truth to find out and do a detailed

9  investigation to find out where exactly the problem lies?

10 Until this day, Your Honor, there was no request to, you know,

11 look into the financials -- you know, accounting systems of my

12 company just because the narrative has been built, and I think

13 it is convenient to stay with narrative.  The truth doesn't

14 matter.  That is what I've been experiencing.

15         Fast-forward six months after that, Your Honor.  Once

16 again, it was brought to our attention that my computers which

17 were seized from my house, they were heavily encrypted, yes,

18 they were heavily encrypted, I agree to that, much stronger

19 than what you usually see in computers, because, Your Honor, I

20 write codes.  I build software systems, so I have to make sure

21 that, you know, in case my laptops go missing, they get lost,

22 they get stolen, the data cannot be recovered.

23         The Government made us aware that, you know, it's

24 heavily encrypted.  We cannot decipher your machines.  Your

25 Honor, we gave them the assurance -- sorry, not assurance, a

1    flat offer, and Mr. Ebert, once again, cannot deny this.  I
2    will give you all the passwords, I will give you the
3    biometrics, I will give you the multifactor authentications.
4    We want to help you uncover everything that is there on my
5    laptops.  Your Honor, no criminal would do this.  Everybody
6    believes today we live in a digital age where our lives reside
7    pretty much on two devices, either our cell phones or our
8    laptops.  Voluntarily, I handed over my cell phone to the
9    Government, and I even gave them the password.  They cannot
10   deny it.  And then I went to the next degree to give them all
11   the details of my laptop to access it.  The Government chose
12   not to do it.  Why?  Because if you access the laptops, you
13   will come across a lot of, lot of unconvenient [sic] and -- you
14   know, truth which is uncomfortable for you, which will take
15   away the narrative that you are building.

16          And lastly, Your Honor -- and once again, you know,
17   this is my question to you:  Has our justice department come to
18   this level that you have to depend on criminals, resort to
19   leveraging criminals?  Your Honor, this organization,
20   Crosscode, which was cert- -- you know, even has brought to the
21   table today, they are international criminals, Your Honor,
22   masquerading as an investment bank, running money laundering
23   operations from Panama, from drug cartels, criminal syndicates.
24   Heck, there is even certain doubts -- some terrorist, you know,
25   money is also connected by them in Panama, bring it into the

1   United States, make fraudulent investments, reap benefits, and

2   those benefits are taken back and given back to those criminal

3   syndicates, be they, you know, money launderers or drug cartel

4   or whatever.  Has our justice department come to this level

5   that you have to resort to leveraging such people and bringing

6   them into this courthouse?  Excuse me, Your Honor.

7          Anyway, Your Honor, that's a different story.  That

8   battle is continuing and that battle will keep going on, and

9   more battles will be coming shortly.  But the fact that I'm

10  trying to -- the point I'm trying to make here, Your Honor,

11  that every single filing besides what I personally gave to the

12  Government, everything else was nothing but a slanderous

13  campaign.  I have been projected to be a criminal even much

14  bigger than Escobar or Osama bin Laden.  That's not who I am,

15  Your Honor.  That's not who I am.  I will tell you, Your Honor,

16  who I am.

17         Once again in the latest filings the Government wants

18  you to believe that I come from a privileged background.  I had

19  all the luxuries growing up.  I had a very, very, very

20  privileged, you know, background.  Your Honor, everything that

21  I have built for myself or my family is on merit, not on

22  privilege, Your Honor.  Right from my lower school, right from

23  my elementary school, I was very, very respected, loved,

24  admired by all my teachers.  That's not privilege, Your Honor,

25  that's merit.

1          Moving into middle school, from grade seven to the

2    grade twelve, Your Honor, I was a prefect of my school

3    continuously for five years running.  That is when prefects

4    have to be changed every year.  I don't know if I was the only

5    one or if there were proceeders before me or after me.  I don't

6    know those details, but I was the only recurring prefect of my

7    batch at that time who went on being a prefect of the school

8    from seventh grade to the twelfth grade, year after year after

9    year.  That's not privilege, Your Honor, that is merit.

10          Finishing high school, I decided to do engineering,

11   Your Honor.  India is the second -- well, the second most

12   populous country, 1.4 billion people.  The engineering school

13   that I applied to, Your Honor, somewhere between 250,000 to

14   300,000 applications are received every year, out of which

15   between 200 and 300 students are accepted.  I was one of those,

16   Your Honor.  That's not privilege.  That's hard work and merit.

17          Same story repeated for my master's degree.  Again,

18   150- to 200,000 applications.  Only 60 students were selected.

19   That's not privilege, Your Honor, that's merit.  When I

20   graduated my master's, I had three job offers, one in

21   Singapore, one in Frankfurt, Germany, and the other one, the

22   third one in the U.S.  And then I was asked to step aside from

23   the placements -- from companies coming to the campus so that

24   other students could get choices too.  Three was the maximum

25   number of job offers you can get.  That's not privilege, Your

1   Honor, that is merit.

2           Coming here to this country and working with every

3   technology company you can think of, Your Honor:  IBM, Hewlett

4   Packard, Cisco, Microsoft, Deloitte.  I have worked for all of

5   them.  Worked -- worked hard growing -- growing recognition,

6   growing my positions and my titles, up to the vice president

7   level, Your Honor, which was my last job in corporate America.

8   And that is not privilege, Your Honor, that was on merit.

9           Then when I started to form my first company, Your

10  Honor, in 2015, 2016, called Crosscode, that was with

11  $4 million of my own -- sorry, not mine, but, you know, me and

12  my wife put together, combined, $4 million of our own savings

13  into the company.  We took it up to a position where we

14  employed close 150 employees, Your Honor, give or take.  I

15  generated employment for about 150 people.  That is not

16  privilege, Your Honor, that is merit and hard work.

17          Me and my team, we worked 16, 18, to 20 hours a day,

18  Your Honor, day, night, working on building a technology which

19  Microsoft -- the world's biggest technology company needs no

20  introduction -- they also tried to build it in 2010.  And I

21  didn't know about that when I was working at Microsoft.  I

22  learned this after I left Microsoft.  And working on this

23  software for two years, Microsoft said it couldn't be built.

24  Me and my team of 10 engineers, we smoked ourselves.  We worked

25  hard to build a software that Microsoft could not do.

 1          And then, Your Honor, some criminals come in from

 2     California and Panama in the garb of being an investment bank.

 3     These criminals, Your Honor, not only just stole my company,

 4     fraudulent after fraudulent perjuries were committed by them in

 5     the garb of a bankruptcy.  Why?  Just because they wanted to

 6     defraud all small investors in the company and embezzle the $4

 7     million that I put, myself, into the company.  Just to do that,

 8     just to accomplish that objective, Your Honor.  This is where

 9     greed and lust comes in.  They're not just happy with the

10     company which was valued at about $100 million, 150 employees,

11     they aren't just happy with what they have stolen, they wanted

12     an additional $4 million that I put into the company.

13          These criminals, Your Honor, they went to the extent

14     of terrorizing, physically intimidated, issuing death threats

15     to people across the world against anybody who would speak

16     against them.  And today, as we speak, Your Honor, I'm saying

17     this with full responsibility, there are six foreign

18     governments who are in the process of making certain

19     representations to the Secretary of State, U.S. Government, to

20     look into the details of these criminals, because they still

21     have not stopped.  Even after defrauding international citizens

22     of the investments and, you know, bringing in this drug money

23     and everything into the country, they have still not stopped.

24     Six foreign governments.  And our government would like to

25     bring these people to the table here?  Anyway that's a

1    different story.  I don't want to, you know, get too repetitive

2    here, Your Honor.

3            After my company was stolen away from me, Your Honor,

4    I was depressed.  I was very, very depressed.  There have been

5    attempts on my life too, which I directly related to Crosscode.

6    Your Honor, these criminals are sitting behind us.  I'll give

7    you one small example to bring to your attention of what kind

8    of people we are dealing with here.

9            Your Honor, criminals were being sent, hard criminals

10   were being sent to my house to terrorize me during the 2019,

11   2020 time frame.  Once such instance, they were hurling abuses

12   at my door, banging my, you know, door with -- I don't know --

13   hammers or what all equipment they had.  My 5-year-old son got

14   so threatened, so terrorized.  Anything could have happened to

15   him.  He was just a 5-year-old kid, Your Honor.  Any kind of

16   mental trauma could have happened to him.

17           We had a dog, a golden retriever.  Our dog was able

18   to sense that the kid is getting terrorized.  Our dog started

19   barking aggressively, and that is when, you know, I was

20   somewhere else in my house and I came running upstairs, and I

21   opened the door.  As soon as I opened the door, my dog came --

22   you know, plunged at those people who are creating this havoc

23   in front of my house.  Your Honor, they had a baseball bat.

24   They hit my dog with a baseball bat.  And these are the

25   criminals who are sitting behind us, who the Government thinks

1   are credible enough to be brought and to make a pleading, Your
2   Honor, in front of you.

3          I am very sorry, Your Honor.  Very -- this is a very,
4   very sad day, especially if the Government had to bring such
5   criminals into the court and -- you know, to testify against me
6   or do whatever they want to do.  Anyway, my battle with them
7   will continue.  It's never going to end.

8          After my company was stolen away from me, Your Honor,
9   like I said, yes, there was some substance abuse.  I got --
10   Your Honor, your life's work was stolen away from you.  It took
11   me a few months to recover.  I stood back up, started another
12   company, again with my own money, Your Honor, again with my own
13   money.  And we have all the records.  Mr. Ebert had all the
14   opportunity to look into the financial systems of the company
15   to figure out where the money into the company came from.
16   Sadly, that was never accomplished.

17          Started off my second company.  Again, built it to a
18   point where today we have close to 100, give or take,
19   employees.  That is the -- I forgot to mention, Your Honor, 150
20   employees were what Crosscode had when they stole my company,
21   give or take.  I don't remember the exact number right now.
22   Within weeks, that number was down to 10.  That is the
23   difference between them and me, because they were not
24   interested in building a valuable company and to create
25   employments for our nation.  All their interest was to figure

1    out some kind of -- the next degree of fraud, and, you know,

2    convert their investments, 2x, 3x, 4x, and then take it back

3    and give it back to their masters, who are those criminals and

4    drug cartels back in Panama or whichever parts of world they

5    were.

6            My second company, Your Honor, KloudGaze, once again,

7    I built it with my own hard work.  I am extremely proud to say

8    more than half of the employees at -- employees and contractors

9    at Crosscode, they had no respect.  They had absolutely no

10   respect to the new masters.  They all left the company and

11   said, We're going to be with you.  We are with you shoulder to

12   shoulder, and we'll build a much superior product, and we'll

13   show these guys what intellect is all about and what hard work

14   is all about.

15           That's what we did, Your Honor, created 100 new

16   employments.  And today, this company is at a point where --

17   and this company was actually a subject of immense, immense

18   slander, Your Honor, immense slander, both direct, indirect,

19   but to give up is not in my character, Your Honor.  It's not in

20   my character.  I stood up.  Every single blow that was coming

21   at me energized me, built it, and today I'm very proud to say

22   that close to 100 of my employees are being acquired by one of

23   the biggest technology companies on the planet.  Your Honor,

24   I'm on a taller journey now, which Mr. Ebert, unfortunately,

25   wants us to believe that it's, you know, by the proceeds of

1    crime.

2            Your Honor -- excuse me, please (indicating).

3            Your Honor, I'm very, very different from what you

4    would have come across or anybody in this culture would have

5    come across as a corporate leader.  Your Honor, when I was at

6    my Crosscode, my first company, like I said, 150, close,

7    employees -- I very, very strongly believe in giving back to

8    the community.  Even though we were not making a lot of money,

9    still, Your Honor, I was cutting checks on a monthly basis to

10   give to charity, people like Shriners Hospital, to help

11   children, unfortunately, born with certain conditions;

12   St. Jude's Hospital, who treat cancer for free; the Wounded

13   Warrior Project.  Five charities were getting contributions

14   from me directly when I was at Crosscode, Your Honor.  The day

15   the company was stolen from me, those contributions stopped,

16   because once again, these criminals don't think about humanity.

17           Today, Your Honor, I'm sure you have received certain

18   letters, and one of the letters is from the chairman of the

19   board of my company too.  And I ask anybody in this court, Your

20   Honor, even the criminals sitting behind us, I ask anybody in

21   this room:  Have you ever come across a leader of a company who

22   says that at -- who puts a condition to the buyer that 5

23   percent, 5 percent of the value of acquisition would be given

24   equally to five charities?  Tell me, Your Honor, have you ever

25   come across -- I have -- this was my executive decision, Your

1  Honor.  I put it as a condition in the purchase agreement that

2  before a single penny would be paid out to me as a shareholder,

3  the first right to receive the payments would be, of course,

4  the U.S. Government, second rights would be all of the vendors

5  who have any accounts receivables due from us, the third right

6  would be to five charities, 5 percent.  And this was a big

7  number, Your Honor.  Like I said, it's a nine-figure

8  acquisition that we were going through and 5 percent is a very

9  big number.  Please tell me, please tell me if you come across

10  any corporate leader who at this early stage would have said

11  that 5 percent of my company's total acquisition costs will go

12  to charities before any single shareholder could be paid.

13       Your Honor, you see these big celebrities when they,

14  you know, make a charitable donation, it's all in their pomp

15  and show, lights, camera, action.  And that's when -- that's

16  not me, Your Honor.  That's not my character.  My parents right

17  from my early childhood, they taught me, Always keep your hand

18  like this (indicating).  Keep giving to the best of your

19  ability.  Once you give, forget about it, forget about it.  And

20  that's what I have done, Your Honor, all throughout my life.  I

21  have already at this age given away close to 25 percent of my

22  net worth, Your Honor, 25 percent to people in need, to

23  charities, and I'll continue doing that.

24       My -- coming to, you know, the next point in the

25  agenda, Your Honor, even though I have put this 5 percent as a

1    condition, I have taken upon myself -- given the recent

2    situations in Europe, I have taken upon myself that whatever be

3    my -- you know, my share's going to be the majority of it

4    because I own 90 percent of KloudGaze.  I'll be giving away

5    some more of my personal value in the company to certain

6    charities and certain -- to help certain efforts in the war

7    that's going on.  That's my personal decision which I've taken.

8    Unfortunately, I cannot change the purchase agreements now to

9    include that as a precondition to the buyer.

10          My third company, Your Honor, which I've just

11   started, which once again, sadly, we have elected to believe

12   that it was proceeds of crime, which it's not.  And Your Honor,

13   this is going to be my last -- my last operative before I take

14   away -- you know, I take retirement and, you know, contribute

15   myself, you know, dedicate myself full time to -- to -- to --

16   to doing humanitarian works and distribute my wealth

17   accordingly.  Your Honor, I'm building the world's first

18   platform that will build -- sorry, that will bring affordable

19   health care to every single individual in the countr- -- not

20   just in the country, but globally, regardless of their

21   abilities to pay.

22          How many times have we been hearing during elections,

23   affordable health care, affordable health care is an issue for

24   a country?  But sadly, there are two sides of the equation when

25   it comes to health care:  Payers, providers.  Both of them are

1    driven so much by greed and profit-making that the health care

2    cost in this country is not coming down.  This is where I have

3    built a technology, Your Honor -- it's more than halfway done.

4    Using technology, we will bring health care affordable to

5    people, regardless of their ability to pay.

6            And I'm very, very proud to let you know, Your Honor,

7    many of our investors who have joined and who are backing my --

8    this third venture, they appreciated my condition to them that

9    we have to create a fund, we have to set aside certain budget

10   to people who cannot afford health care.  I will pick up the

11   cost of delivering health care to them.  I will pick up the

12   cost of delivering health care to them, provided they meet

13   certain requirements, which, you know, generally put forth the

14   case that they cannot afford, you know, health care.

15           And given the recent situations in -- in -- in --

16   in -- in Europe, Your Honor, only yesterday I received a phone

17   call from somebody -- and I can't get into the details there,

18   but I was asked that, The health care systems and the medical

19   infrastructure, you know, might be coming to a collapse, given

20   the amount of influx of people coming in, and we need to do

21   something seriously about it.  And this is a time when you need

22   to speed up your efforts on building your, you know, technology

23   so we can take care of the people coming in.

24           And even before the war started, Your Honor -- I

25   won't get into political arguments, who's right, who's wrong.

1  The biggest casualty of war are all those innocents, Your

2  Honor.  Even before the war started, I increased the resources,

3  sped up the development so that, you know, we can quickly bring

4  this technology in times of need.  Of course, yes, all ventures

5  are commercial in nature, and I'm not denying that.  This is a

6  commercial venture.  Yes, there will be profit-making, but Your

7  Honor, how many times have you heard in your life, Your Honor,

8  respectfully, that business leaders are the beginning, are the

9  beginning itself.  Even before they make a single penny out of

10  their venture, they create a certain budget to offer services

11  for free for people who are needy.  That's what defines me,

12  Your Honor.  That is what defines me.

13         Your Honor, we have been hearing a lot of these

14  stories, concepts of intended losses and actual losses.  There

15  was one last thing that I wanted to, you know, share some light

16  on this, Your Honor.  This entire episode -- now, somebody has

17  to be responsible for what the actual and intended losses here

18  do.  Taxed with the slander campaign that was unleashed upon

19  me -- and, Your Honor, I humbly say that that was the biggest

20  incarceration.  For me, my employees, my family, my children,

21  that was the biggest incarceration.  I had to take my company

22  internationally, Your Honor.

23         Our government lost tens of millions of dollars.

24  That is an actual loss, Your Honor.  Who is responsible for

25  this actual loss just because of some falsehoods?  And it

1    suited a certain narrative to be spread around me.  Our

2    government has lost, has lost, tens of millions of dollars in

3    taxes, in employments, that's a bear minimum, Your Honor.  And

4    as of today, I'm committed in having my third company being a

5    U.S. company, but -- and we have committed, Your Honor, we

6    already have employees at the table here.  I'm already

7    providing jobs.  We are on track, Your Honor, to generate about

8    close to 250 jobs by the end of this year in the country, in

9    the U.S., and mostly in Minnesota, Your Honor.

10            God forbid, if I'm to -- if I'm pushed to take this,

11   you know, company, once again, internationally, Your Honor,

12   abandon this because of the slander campaign against me, the

13   intended loss, Your Honor, we have done some calculations, it

14   is going to be a minimum of $1 billion over the next seven to

15   ten years.  Who is going to be responsible for this?

16            So I'm, again, imploring you, Your Honor, that

17   because of the incarceration, because of the slander campaigns

18   that have been unleashed -- and that is the biggest

19   incarceration in my opinion, Your Honor.  Not only our country

20   has lost -- has -- there is an actual loss, but there is an

21   intended loss too.  Who's going to be answerable?  Has there

22   been any, you know, thinking behind that, Your Honor, before

23   unleashing a campaign against me?

24            Your Honor, I'll just wrap it up, finally, by saying,

25   I know, Your Honor, whatever happened, it was a mistake, but it

1    does not define me.  It does not define who I am.  Your Honor,

2    my wife, my family, my kids, my employees, they mean everything

3    to me.

4            Your Honor, starting with my wife first, we have been

5    married 21 years, known each other 25 years.  Your Honor, she's

6    a stroke surviver.  She is a stroke survivor.  At a very, very

7    young age, 37 years old, she survived a stroke which left

8    her -- the entire right side of her body fully paralyzed -- and

9    she is right-handed, by the way -- loss of speech, complete

10   loss of motion, everything.  She was a practicing surgeon.  She

11   was delivering babies.  The doctors felt that probably she'd

12   never go back to, you know, her usual career.  Thankfully, she

13   did.  But again, Your Honor, she is not herself.

14           There are -- she has already completed a full

15   recovery.  She cannot recover any more now.  Due to her stroke

16   and due to, you know, the partial recovery she has made, she

17   needs me, Your Honor.  And given the young age at which she had

18   the stroke -- and it was because of a neurological brain

19   hemorrhage -- Your Honor, doctors feel that she'll have --

20   there will be another stroke for her.  There will be another

21   stroke for her.

22           THE COURT:  You know what?  I'm done.  I'm done.

23           THE DEFENDANT:  Okay.

24           THE COURT:  From what I'm hearing, I'm going to ask

25   you a question.

1            THE DEFENDANT:  Please.

2            THE COURT:  Do you believe you're guilty of the

3    offense you were charged in the information that is fraud?  Do

4    you believe you are guilty of that?

5            THE DEFENDANT:  Your Honor, I've already said it.

6    Yes, of course I am guilty.  I have pled it.

7            THE COURT:  So you're not saying to me or anyone else

8    in this courtroom all -- with all of the things you said, "I'm

9    not guilty" of what you were charged in the information,

10   correct?  Is that true?

11           THE DEFENDANT:  No, Your Honor.  I have accepted --

12   I'm very sorry if I came across that way, but I've accepted my

13   guilt.  I am guilty, Your Honor.  I am guilty.

14           THE COURT:  Okay.  Because I was a little

15   concerned --

16           THE DEFENDANT:  No, no --

17           THE COURT:  -- about what you were saying, that maybe

18   we had somebody who believed that they were innocent, and

19   somehow or another being caught up in the --

20           THE DEFENDANT:  No, Your Honor.  I'm very sorry if

21   I -- in my emotions, if I came across that way.

22           THE COURT:  Okay.

23           THE DEFENDANT:  I have absolutely -- you know, I have

24   never contested what charges Mr. Ebert has brought against me.

25   I've not contested it at all.

```
 1              THE COURT:  Well, I know Mr. Ebert would probably ask
 2      the same question if I hadn't, because it was coming across
 3      very strongly that you feel you are a wronged person, you've
 4      been wronged by a lot of folks.  And I thought maybe you were
 5      considering this particular charge a wrong also, but....
 6              THE DEFENDANT:  No, Your Honor.
 7              THE COURT:  Okay.  Fine.
 8              THE DEFENDANT:  I have been wronged.  I'm not denying
 9      that.
10              THE COURT:  I understand.
11              THE DEFENDANT:  I have been wronged by way of --
12              THE COURT:  We have that pretty well documented now.
13      It's on the record.
14              THE DEFENDANT:  Thank you, Your Honor.  Thank you.
15              THE COURT:  All right.  Thank you.
16              Mr. Ebert, you get a chance now.
17              THE DEFENDANT:  A few more --
18              MR. BIRRELL:  No, you're done.
19              THE COURT:  Mr. Birrell, do you want to add
20      something?  I don't know.
21              THE DEFENDANT:  Your Honor, I just had a couple more
22      points to make.  That's about it.
23              THE COURT:  Oh, okay.
24              THE DEFENDANT:  So Your Honor, I --
25              THE COURT:  Oh -- no.  You know, I think I've been
```

1    pretty patient.  And I'm not sure -- talk to Mr. Birrell and

2    see if he thinks you should add something, would you?  He's a

3    good lawyer.  He's got good judgment.  Would you just ask him?

4    And I'll let Mr. Ebert respond for the Government.  He gets

5    that chance.  That's how we do things here.  But then talk to

6    Mr. Birrell, and if he thinks you should say some more things,

7    I'll listen.  I want to hear you out, but I think maybe -- I'm

8    just going to suggest that maybe we have heard you out.  And I

9    don't want to say anything more than that.  I don't want to be

10   judgmental about that part.  My job is being judgmental about

11   other things, but not that.  Okay?  Do you understand?

12           So Mr. Ebert, why don't you go ahead, please.

13           MR. EBERT:  All right.  Thank you, Your Honor.

14           And Your Honor is correct that the question that was

15   just posed from the bench is a question I was going to ask.

16   It's certainly what was in my mind as I was listening to Mr.

17   Sharma go on over all of this -- these number of minutes here

18   in the courtroom.

19           Your Honor, the Government is asking for a sentence

20   to be imposed that is within the advisory guidelines range.

21   We've laid out, I think, in clear terms several alternative

22   bases for why we're seeking such a sentence.  One such bases

23   for why we think such a significant advisory guideline sentence

24   is warranted here is that Mr. Sharma's characteristics, and

25   particularly his track record in committing this large fraud

1    and his track record while he's been on release conditions,

2    strongly, strongly evidence an individual who is not deterred,

3    who still clearly lacks an appreciation for the gravity of the

4    crime that he committed.

5            While, indeed, he has acknowledged the crime in the

6    technical sense, Your Honor, there still remains abundantly

7    clear a lot of finger pointing that is going on for Mr. Sharma,

8    and everyone else is at fault.

9            He points the finger at the prosecution.  He points

10   the finger, Your Honor, at other individuals in the courtroom,

11   calling them, as I understood it, terrorists and criminals, if

12   I understood the language correctly.  But to be clear, Your

13   Honor, the person -- or one of the people to whom Mr. Sharma is

14   describing to you, Your Honor, to be a criminal and a terrorist

15   is Mr. Steve Schleicher, who represents the business entity

16   that's submitted an impact statement.

17           I'll leave to Your Honor's understanding of the

18   parties in this courtroom who's a terrorist and who's a

19   criminal.  Language like that is absurd.  Language like that

20   from Mr. Sharma is absurd.  It is offensive.  It is beyond the

21   pale.  There is one person in this room that stands before Your

22   Honor as a convicted fraudster, one person.  Obviously, it's

23   Mr. Sharma.

24           More than that, there's only one person in this room

25   that stands before Your Honor having been proven and having,

1    additionally, admitted to submitting over months and months a

2    stack of lies to multiple lenders throughout the United States,

3    trying to get $9.6 million based upon lies, fake documents that

4    Mr. Sharma created, bogus documents, trying to make it look

5    like he had certain assets, lying with other facts and figures

6    in the loan applications.  For what?  To enrich himself

7    unlawfully.

8            What is so aggravating about Mr. Sharma's conduct,

9    Your Honor, is the time frame in which he unleashed his fraud.

10   A terrible time in American history, a once-in-a-century global

11   pandemic.  I can still think, Your Honor, in my own mind

12   headlines day after day in those fateful early weeks of 2020 on

13   the Pioneer Press and the Star Tribune about Minnesota

14   businesses and Minnesota small businesses that were struggling

15   for survival.  Many lost that struggle because of the pandemic,

16   losing not only their businesses, Your Honor, but that meant

17   any number of workers that were employed by those struggling

18   small businesses.

19           One important lifeline designed specifically to help

20   small businesses like that was this SBA loan program, a very

21   unprecedented one that Congress authorized under the CARES Act.

22   That was an important lifeline for many small businesses and

23   many workers.  Unfortunately, it was also a tempting target for

24   people who were intent on committing fraud.  And so it's in

25   that context that the Government is asking for such a serious

1    sentence, to send an important message not only just to Mr.

2    Sharma, but to anyone else how unacceptable that conduct is and

3    that it will be met with a severe sentence.  And in that time

4    of national crisis, Mr. Sharma used taxpayer money to fund any

5    number of unlawful aims, even including installing a $64,000

6    pool in his backyard on the dime of the American taxpayers.  We

7    believe, Your Honor, that that warrants a significant sentence

8    of incarceration along the lines of what we're requesting.

9            Part of Mr. Sharma's conduct also involves using,

10   without any authorization, the names and identities of others,

11   not just the business entity at issue, who he labels terrorists

12   and criminals, but his own wife, Your Honor.  One of his

13   fraudulent loans he submitted in the name of his wife without

14   her knowledge and without her approval.

15           Now, Mr. Sharma spoke at much length about his

16   vaunted assets, his purported vast amount of wealth that's

17   either actual or it's prospective, and this is some windfall

18   that if we just give him one more day, will come his way.  I

19   want to emphasize a couple points on that, Your Honor.

20           After Mr. Sharma pled guilty, he engaged in

21   discussions with folks in the U.S. Attorney's Office and the

22   FBI, asset interviews, trying to gain an understanding of what

23   types of funds he might have to begin thinking about paying

24   restitution.  The PSR, Your Honor, certainly notes that he has

25   substantial assets, multimillion dollar assets, according to

1   Mr. Sharma.

2          In 2019, before the pandemic, the PSR notes that his

3   household income was $1.2 million, so he's certainly an

4   individual with means, Your Honor.  He has not paid one penny

5   of his massive restitution obligation.  I mentioned a moment

6   ago that he had discussions with the U.S. Attorney's Office

7   about his assets.  One of the documents that he presented, and

8   part of the discussion that he had, Your Honor, is that in the

9   latter, late part of 2021, Mr. Sharma had bank accounts with

10  approximately $493,000, so nearly a half-million dollars, Your

11  Honor.  The Government thereafter moved for an order from Your

12  Honor, which Your Honor entered on January 13th of this year, a

13  preliminary order of forfeiture, which, in part, authorized the

14  Government to seize that amount that I just mentioned, the

15  remaining half-million dollars.

16         When the Government went to obtain that money, it

17  learned that Mr. Sharma had moved the money.  He moved that

18  money overseas, Your Honor, and he said he moved that money

19  overseas to India.  I think that's an important point that I

20  want to emphasize, Your Honor, because it underscores he is not

21  deterred.  It demonstrates the utter lack of seriousness with

22  which he takes these proceedings.  It's also part and parcel of

23  a very troubling record that he's had while he's been on

24  release, and we've noted that in our pleadings, Your Honor.  A

25  serious incident involving his own household at Mr. Sharma's

1    hand that involved the police coming, that required changes

2    from the court to his release conditions, and then just months

3    later, he's, once again, violating his release conditions in an

4    incident involving another individual who had to get an order

5    of protection against Mr. Sharma.

6           That is a troubling record.  It is a troubling record

7    to the Government, and it's an additional indication that a

8    significant sentence, along the lines of what we're asking,

9    Your Honor, in the guidelines range, is appropriate.

10          So Your Honor, we ask for that range of imprisonment.

11   We ask that restitution be imposed in the approximate

12   $1.7 million figure that is cited in the PSR and that's agreed

13   upon by the parties in the plea agreement.  We also ask that

14   any term of supervised release come with it, Your Honor,

15   treatment after he would be released from custody on the issues

16   of mental health and on the issue of addiction.

17          And on those two points, those are yet another reason

18   why a significant period of custody is important, so he can

19   avail himself of those two forms of treatment while he is in

20   custody.  It's clear, there's no dispute between the two sides,

21   that those are issues plaguing Mr. Sharma.

22          Thank you, Your Honor.

23          THE COURT:  Oh, thank you.

24          Mr. Birrell, I'm going to come back to you.  What was

25   your decision?

```
1              MR. BIRRELL:  You're done?

2              THE DEFENDANT:  Actually, after listening to Mr.

3    Ebert, Your Honor --

4              MR. BIRRELL:  I think --

5              THE DEFENDANT:  Or you can agree with them.

6              MR. BIRRELL:  Huh?

7              THE DEFENDANT:  Or if you want to agree with them,

8    you can agree with them.

9              MR. BIRRELL:  May I talk to him for a minute?

10             THE COURT:  Yes.

11        (A sotto voce discussion was held between the defendant

12        and counsel.)

13             THE COURT:  Um, Mr. Birrell, I'm going to break.  I'm

14   going to give you more time to talk to your client --

15             MR. BIRRELL:  If it pleases the Court --

16             THE COURT:  -- because I think -- I think I'm going

17   to take a break too.  Frankly, the reason I want to take a

18   break is I want to talk with my probation officer again.  We

19   had a chat about this, as we always do.  That's one of the

20   things we -- we have probation officers that know more about

21   the cases than most all of us in the courtroom do, as you know.

22             Probably, Mr. Sharma, you found out from the

23   presentence investigation they made, oftentimes I'm told that

24   defendants find out things about themselves they never knew

25   before through the presentence investigation.
```

1          But anyway, I want to talk to her, and so I'm going

2     to take about a 5-minute recess.  You then have a chance to

3     chat with Mr. Sharma at any more great length, anything else

4     you need to do.  I don't want to see anybody leave the

5     courtroom unless they must for some reason.  We'll be about 5

6     minutes.

7          Madam court reporter, if you'd come -- not -- I'm

8     sorry, madam court reporter.  Thank you for doing what you're

9     doing, but madam probation officer, will you come back, please.

10          THE CLERK:  All rise.

11     *(A brief recess was taken.)*

12          THE COURT:  Take your seats, please.

13          First, Mr. Birrell, anything?

14          MR. BIRRELL:  I believe Mr. Sharma has completed

15     his -- oops, sorry (adjusts microphone).

16          THE COURT:  Thank you.

17          MR. BIRRELL:  Sorry.  Mr. Sharma has completed his

18     allocution for the Court.

19          THE COURT:  Okay.  Thank you.

20          Thank you, Mr. Sharma.  You know, and that's probably

21     a correct decision.

22          And I think we heard you out too, Mr. Ebert, didn't

23     we?

24          MR. EBERT:  Yes, Your Honor.  Unless there's anything

25     else you'd like me to address, I was planning to --

1          THE COURT:  I want to make sure that I hear everybody

2     out in this case, and I think we have.

3          MR. EBERT:  Thank you.

4          THE COURT:  Well, as counsel know, in a case like

5     this -- there being no objections to the factual statements

6     contained in the presentence investigation report that affect

7     the guidelines calculation, the Court will adopt those

8     statements as its findings of fact in a case like this.

9          As far as the application of the guidelines to the

10    facts, there are no remaining objections regarding the

11    application of the guidelines to the facts.  And accordingly,

12    the Court determines that the guidelines are as follows:  A

13    total offense level of 26 with a criminal history category of

14    I, which might lead to an imprisonment range of 63 and 78

15    months, and a supervised release of 1 to 3 years, a fine range

16    of 25,000 to $250,000, and a special assessment of $100.

17         Now, the statute under which the defendant has been

18    convicted sets a maximum term of imprisonment of 20 years, a

19    maximum period of supervised release of three years, and a

20    maximum fine of $250,000.

21         Now, the defendant's argued that he should receive a

22    downward departure under Guidelines Section 2B1.1, comment note

23    21(c), because the amount of loss, although accurately

24    calculated, substantially overstates the seriousness of the

25    offense and the likelihood of recidivism.  And the Court

1   disagrees and finds that the substantial amount of loss
2   accurately reflects the seriousness of the offense, and
3   therefore the motion will be denied.
4          There is also -- the defendant has made a motion for
5   a downward variance under the factors set forth in 18 U.S.C.
6   Section 3553(a).  The Court agrees that a variance is warranted
7   under these factors and will sentence defendant accordingly.
8          Mr. Sharma, you have been charged in Count I of the
9   information with wire fraud in violation of 18 U.S.C. Section
10  1343.  That is a Class C felony.  And based on your plea of
11  guilty to that charge, it is considered and adjudged that you
12  are guilty of that offense, and therefore it is adjudged that
13  you are committed to the custody of the United States Bureau of
14  Prisons for imprisonment for a term of 60 months.
15         Is there a placement request at this point, Mr.
16  Birrell?
17         MR. BIRRELL:  Your Honor, I believe he --
18         THE COURT:  You don't have to stand, by the way.
19         MR. BIRRELL:  Sorry.
20         THE COURT:  As long as you're standing, go ahead.
21         MR. BIRRELL:  All right.  Thank you.
22         Mr. Sharma, would request a designation at Duluth or
23  another (indicating) --
24         THE COURT:  Yeah, that's the reason.
25         MR. BIRRELL:  I'm sorry.  (Indicating.)  I can't hear

1    as well as I used to either.

2            Duluth would be our designation request of the Court,

3    or somewhere close to home here if Duluth is not possible.

4            THE COURT:  Okay.  And I will make that

5    recommendation.

6            Mr. Sharma, the Bureau of Prisons accepts the

7    recommendations of judges as to places of incarceration, but

8    they often don't agree with the judge.  But I will make that

9    recommendation.  The Bureau of Prisons makes up its own

10   reasons.  They have reasons for doing what they do, and they're

11   going to make up their own decision, but that will happen in

12   the near future.

13           Further, it is ordered that pursuant to 18 U.S.C

14   Section 3583, you're to serve a term of supervised release of

15   two years under the following conditions:  First, you must

16   report to the U.S. Probation and Pretrial Services Office in

17   the district in which you are released within 72 hours of

18   release from the custody of the Bureau of Prisons.

19           Second, you shall not commit any crimes, federal,

20   state, or local.  Third, mandatory drug testing will be

21   suspended based on the Court's determination that you pose no

22   risk of substance abuse.  Fourth, you shall not possess a

23   firearm, ammunition, destructive device, or any other dangerous

24   weapon.  Fifth, you shall cooperate in the collection of DNA as

25   directed by the probation officer.

1          You shall abide by the standard conditions of

2     supervised release that have been adopted by the Court,

3     including the following special conditions:  Number one, you

4     shall abstain from the use of alcohol and other intoxicants and

5     not frequent establishments whose primary business is the sale

6     of alcoholic beverages.  Second, you shall complete an

7     immediate assessment or participate in a program for substance

8     abuse as approved by the probation officer on release or

9     relapse during your term of supervised release.  That program

10    may include testing and inpatient or outpatient treatment,

11    counseling, or a support group.

12          Further, you shall contribute to the cost of such

13    treatment as determined by the Probation Office Co-Payment

14    Program, not to exceed the total cost of treatment.  Third, you

15    shall participate in a psychological or psychiatric counseling

16    or treatment program as approved by the probation officer.

17    Further, you shall contribute to the cost of such treatment as

18    determined by the Probation Office Co-Payment Program, not to

19    exceed the total cost of treatment.

20          Fourth, you shall provide the probation officer

21    access to any requested financial information, including credit

22    reports, credit card bills, bank statements, and telephone

23    bills.  Fifth, you shall be prohibited from incurring new

24    credit charges or opening additional lines of credit without

25    approval of the probation officer.

1         Further, it is ordered that mandatory restitution in

2    the amount of $1,773,600 is due immediately to the victim banks

3    and/or the Small Business Administration as appropriate.

4    Credits against restitution will be applied as necessary.

5    Payments are to be made payable to the Clerk of the United

6    States District Court for disbursement to the victims.

7         Over the period of incarceration you shall make

8    payments of either quarterly installments of a minimum of $25

9    if you're working non-UNICOR, or a minimum of 50 percent of

10   monthly earnings if working UNICOR.  You shall participate in

11   the inmate financial responsibility plan while incarcerated.

12   Payments of not less than $500 per month are to be made over a

13   period of two years, commencing 30 days after the date of your

14   release from custody.  Payments are to be made payable to the

15   Clerk of the United States District Court for disbursement to

16   the victim.  The interest requirement is waived in accordance

17   with 18 U.S.C. Section 3612(f)(3).

18        Your obligation to pay the full amount of restitution

19   continues after -- even after the term of supervision has

20   ended, pursuant to federal law.  If you are unable to pay the

21   full amount of restitution at the time supervision ends, you

22   may work with the U.S. Attorney's Office Financial Litigation

23   Unit to arrange a restitution payment plan.  Pursuant to 18

24   U.S.C. section 3013, you must also pay the United States a

25   special assessment of $100, which is also due immediately.

 1           Now, the Court finds that this sentence imposed is

 2    reasonable and appropriate in light of the consideration set

 3    forth in 18 U.S.C. Section 3553(e).  The Court has taken into

 4    account the nature and circumstances of the instant offense, as

 5    well as the history and characteristics of the defendant, and

 6    finds that the sentence imposed is sufficient, but not greater

 7    than necessary, to afford adequate deterrence to future

 8    criminal conduct.  No fine will be imposed because of

 9    defendant's impending incarceration and his significant

10    restitution obligation.

11           The Court now accepts the plea agreement in this case

12    because it is satisfied that the agreement adequately reflects

13    the seriousness of the defendant's offense behavior and that

14    accepting the plea agreement will not undermine the statutory

15    purposes of sentencing.

16           Now, Mr. Sharma, you have waived or given up your

17    right to appeal any sentence at or below 78 months.  I've given

18    you a sentence below that, and I believe you've given up your

19    right to appeal, but you talk to your counsel and determine

20    whether there is a reason to appeal.  If he advises you there

21    is, then make sure that a notice of appeal is filed within 14

22    days of today, very short time period, or you'll lose the

23    right.  Do you understand that?

24           THE DEFENDANT:  Sure.

25           THE COURT:  Okay.  Also, if you qualify, you can also

1    file for in forma pauperis, that is the government will pay

2    your legal fees and also pay the costs and expenses of your

3    appeal if you qualify and make an application.  You understand

4    those rights you have also?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Okay.  There was a preliminary order of

7    forfeiture entered on January 12th.  Is there anything more the

8    Court should do concerning that order?

9              MR. EBERT:  Yes, Your Honor, and that's at docket

10   No. 87.

11             THE COURT:  Yes.

12             MR. EBERT:  The Government would just request that

13   the preliminary order of forfeiture be incorporated and made a

14   part of the final J&C that will be issued in this matter.

15             THE COURT:  All right.  So ordered.  We'll do that.

16             This case -- we're going to talk about custody, and

17   I'll hear from the Government first.

18             What's your view of custody?  I have an idea of what

19   Mr. Birrell might say.

20             MR. EBERT:  Your Honor, this is not an easy question

21   to answer in light of some of the factors that are at play in

22   this case and with Mr. Sharma.  The Government is amenable,

23   Your Honor, to a short window of time to enable Mr. Sharma to

24   self-surrender, but we would -- we would be opposed to

25   something that, in our view, would be too long in time, Your

1  Honor, because of concerns about some of his conduct while on

2  release and some other issues that we've identified, including

3  his expressed intent to travel as soon as he is able to do so.

4  Now, his passport remains in the custody of Pretrial and

5  Probation, but Your Honor, stranger things have happened.

6  Even --

7          THE COURT:  Yeah, we do know.

8          MR. EBERT:  Yes.  So Your Honor, the short answer is

9  we are amenable to a small window of time to enable him to

10  self-surrender at a facility, if that's acceptable to the

11  Court.

12          THE COURT:  Thank you.

13          Mr. Birrell, I do want to hear what you have to say,

14  even though I presume what it will be.

15          MR. BIRRELL:  I appreciate that.  Yeah, we would ask

16  for --

17          THE COURT:  Can you turn on your mic again, please.

18          MR. BIRRELL:  I'm sorry, Your Honor.

19          THE COURT:  It's all right.

20          MR. BIRRELL:  We'd ask for the privilege of voluntary

21  surrender at the designated institution, and perhaps 30 days.

22  That seems like a short window.

23          THE DEFENDANT:  Can we talk off the line before we

24  make a commitment --

25          THE COURT:  If you want to talk to Mr. Sharma, go

1    ahead.

2         *(A sotto voce discussion was held between defendant and*

3         *counsel.)*

4         MR. BIRRELL:  Um, Your Honor, I would stand by my

5    request.  Mr. Sharma would like a little more time, but given

6    the conversations with the Government, I think 30 days is the

7    best we can reasonably ask the Court for.

8         THE COURT:  Well, I'm going to grant the motion of

9    both of you, I think, a stipulation, as far as voluntary

10   surrender.  This is not a mandatory detention case, so I don't

11   think I need the magic words from the Government, but I am

12   going to grant the voluntary surrender, but I think because of

13   what I've heard, and what I've heard from the probation

14   officer, of the activities, as Mr. Ebert has alluded to, I'm

15   going to make it a week, that he turn himself in at 10:00 on

16   March 16th to the marshals here in the courthouse in

17   Minneapolis.

18        Is there anything else that should come before the

19   Court?  There is a matter of the impact letters and -- and from

20   Crosscode and also if there is any other victim statements,

21   whether they should be sealed and for how long?

22        MR. EBERT:  Your Honor, nothing needs to be sealed

23   that the Government has submitted.

24        THE COURT:  Mr. Birrell, anything that you believe

25   should be sealed?

1            MR. BIRRELL:  I don't think there is, Your Honor.

2    Thank you.

3            THE COURT:  Okay.  Well, unusual, but so be it.

4            Court's going to stand in recess.  Thank you.

5        (Court adjourned at 2:54 p.m., 03-10-2021.)

6                            *   *   *

7            I, Brittany K. Blesener, certify that the foregoing

8    is a correct transcript from the record of proceedings in the

9    above-entitled matter.

10                       Certified by: /s/Brittany K. Blesener
                                    Brittany K. Blesener, RPR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25